IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | Case No.: 1:21-cr-00570 (APM) |
| | : | |
| **v.** | : | 18 U.S.C. § 111(a)(1) |
| | : | |
| **LANDON KENNETH COPELAND,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, LANDON KENNETH COPELAND, with the concurrence of his attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

### *The Attack at the U.S. Capitol on January 6, 2021*

1. The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by U.S. Capitol Police (USCP). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.

2. On January 6, 2021, the exterior plaza of the Capitol was closed to members of the public.

3. On January 6, 2021, a joint session of the United States Congress convened at the Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election,

which had taken place on Tuesday, November 3, 2020. The joint session began at approximately 1:00 PM. Shortly thereafter, by approximately 1:30 PM, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4. As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside.

5. At approximately 2:00 PM, certain individuals in the crowd forced their way through, up, and over the barricades. Officers of the USCP were forced to retreat and the crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks as required by USCP officers or other authorized security officials.

6. At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 PM, individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the Capitol, requiring the expenditure of more than $1.4 million dollars for repairs.

7. Shortly thereafter, at approximately 2:20 PM, members of the House of Representatives and of the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 PM on January 6, 2021. In light of the dangerous circumstances caused by the unlawful entry to the Capitol—including the danger posed by individuals who had entered the Capitol without any security screening or weapons check—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and USCP confirmed that the building was secured. The proceedings resumed at approximately 8:00 PM after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

***LANDON KENNETH COPLEAND's Participation in the January 6, 2021, Capitol Riot***

8. The defendant, LANDON KENNETH COPELAND, lives in Hildale, Utah. The defendant took approximately one week off work to travel to and return from Washington, D.C., via automobile—a trip of approximately 2,300 miles. The purpose of the defendant's trip to Washington, D.C., was, among other things, to attend the former President's rally on January 6, 2021. The defendant traveled to Washington, D.C. with his girlfriend, who is also from Utah, and stopped along the way to pick up his brothers.

9. During the morning of January 6, the defendant attended a political rally on the National Mall. He and his girlfriend left the rally to get food and missed the former President's speeches. When the defendant returned to the Mall, he saw a group of people gathering near the U.S. Capitol building and joined that group.

10. At about 1:11 p.m., the defendant was part of a group of rioters that had gathered in the West Plaza, a ground-level area on the west side of the U.S. Capitol grounds. The group had pushed officers with the U.S. Capitol Police (USCP) back to a point near the Capitol steps. While there, another rioter approached USCP Officer T.R. and began shouting at him. This other rioter placed his hands around Officer T.R.'s collar or neck. From behind, the defendant pushed that other rioter, and Officer T.R. fell to the ground. Officer T.R. sustained injuries to his knee, back, and hip during his defense of the Capitol on January 6, 2021, and attributes some of his injuries to this incident.

11. Immediately after Officer T.R. fell to the ground, other USCP officers came to his assistance. The defendant grabbed a riot shield belonging to one officer and pushed back against the police line. He grabbed another officer's jacket and grappled with that officer, pushing the officer backward. Then, he lowered his body to block USCP officers as they advanced to protect Officer T.R. and as they attempted to control the crowd.

12. As these assaults occurred, members of the Metropolitan Police Department (MPD) arrived to assist USCP officers. MPD officers began placing metal bike rack-style barricades across the West Plaza in an effort to keep rioters away from, and establish a perimeter around, the Capitol Building.

13. At approximately 1:14 p.m., another rioter grabbed one of these barricades and pulled it away from the MPD officer standing with it. The defendant quickly joined in the effort to pull the barricade away from the officer. Thereafter, the defendant and other rioters engaged in a tug of war with MPD and USCP officers who attempted to reclaim the barricade. One or more of these officers deployed a chemical spray against members of the crowd, including the defendant.

In response, the defendant charged law enforcement officers with the fence, pushing and throwing it into multiple officers.

### *Elements of the Offense*

14. The defendant knowingly and voluntarily admits to all the elements of 18 U.S.C. § 111(a). Specifically, defendant admits that he forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with any person designated in 18 U.S.C. § 1114 while engaged in or on account of the performance of their official duties. Specifically, the defendant admits that joined another rioter in an effort to take a metal bike rack barricade from officers of the United States Capitol Police and Metropolitan Police Department; then, after police deployed a chemical spray against him, the defendant used the bike rack as a weapon against police by pushing or throwing it at them. The defendant further admits that he knew at that time of the assault of, resisting, opposition to, impeding of, intimidation of, or interference with the officers that the officers were engaged in the performance of their official duties or that he assaulted, resisted, opposed, impeded, intimidated, or interfered with the officer on account of their performance of their official duties.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: *Michael J. Romano*
Michael J. Romano
Trial Attorney / Detailee
IL Bar No. 6293658

## DEFENDANT'S ACKNOWLEDGMENT

I, Landon Kenneth Copeland, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 05/16/22      _Landon – Kenneth : Copeland, Bene._
                    Landon Kenneth Copeland
                    Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 5/17/2022     _Ryan D. Stout_
                    Heather Shaner, Esq.
                    Ryan Stout, Esq.
                    Attorney for Defendant