**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL NO. 1:21-cr-00570-APM** |
| **v.** | : | |
| | : | |
| **LANDON KENNETH COPELAND,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Landon Kenneth Copeland to fifty-two months' incarceration, which is in the middle of the Sentencing Guidelines range,[1] three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

## I.     INTRODUCTION

The defendant, Landon Copeland, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars' in losses.[2]

---

[1] As noted below, at 27-28, the defense disputes this Guidelines range.
[2] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police."

Copeland was present in the West Plaza shortly after rioters overran police lines at the Peace Circle and forced officers to retreat. By about 1:10 p.m., he had made his way to the front of the lines. He pushed another rioter (Christopher Quaglin) into U.S. Capitol Police ("USCP") Officer T.R. Then, over the course of about one to two minutes, he grappled and fought with other officers who came to Officer T.R.'s aid. At about 1:13 p.m., and during this conflict, Metropolitan Police Department ("MPD") officers arrived in the West Plaza to assist the overwhelmed USCP officers. They quickly set up a line using metal bike rack barricades to keep rioters away from the Capitol. At 1:15 p.m., another rioter—without provocation—tried to steal one of those barricades away. Copeland joined in that effort. He and other rioters engaged in a tug-of-war with the officers over the barricade. When officers deployed chemical spray to subdue Copeland and other rioters, he turned the barricade into a weapon, charging at officers with it and tossing it at them. And months later, when given the opportunity to reflect on his actions, Copeland said that he regretted nothing and would "do it all again for the people I love" (i.e., other members of the mob). To date, he has not demonstrated any remorse for any aspect of his conduct.

The government recommends that the Court sentence Copeland to 52 months of incarceration, which is at the midpoint of the advisory Guidelines' range of 46 to 57 months, which the government submits is the correct Guidelines calculation. A 52-month sentence reflects the gravity of Copeland's conduct and seeks to ameliorate the substantial risk that he will commit violent crimes in the future.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the description of the attack on the U.S. Capitol provided in Copeland's Statement of Offense. (ECF No. 34 ¶¶ 1-7.)

***Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds***

Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible. Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Figure 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds. At approximately 12:45 p.m., a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway. Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's Exhibit 1 as "1st Police Barricade," circled in red and marked as Area A. At 12:52 p.m., the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to

engage with USCP officers at the first manned barrier. Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob. By 12:58 p.m., the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Exhibit 1. They flooded the area labeled "Lower West Plaza" Area C on Government's Exhibit 1, pushing against the barricade there.



*Figure 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza. For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles,

pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Figure 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left). In the photo of the nearly completed bicycle rack barrier line as of 1:39 p.m., a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.



*Figure 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

7

*Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred police officers on January 6. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement

officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

**B.      The Defendant's Role in the January 6, 2021 Attack on the Capitol**

***Travel to Washington, D.C.***

On January 6, 2021, Copeland lived in Hildale, Utah. The defendant took a week off work

to travel to and return from Washington, D.C., a trip of approximately 2,300 miles each way.

As expanded upon below, after his arrest in this case, Copeland discussed his motivations for travel to the Capitol in at least two interviews with the media. During one interview with a local Fox affiliate, Copeland claimed that he was motivated to go travel to Washington, D.C. by police brutality. He stressed that he has had his vehicle, person, and home searched without a warrant. When asked, "what role did [former President] Trump play?" Copeland answered, "he invited us to be there. He announced it. He said 'come to the Capitol.' I heard it as a call." The interviewer pressed: "Trump's big thing was that the election was 'stolen from him.'" Copeland admitted that he was "somewhat concerned about the voter fraud issues" but said that he did not vote because his Missouri driver's license was suspended. In an interview with NBC Washington, Copeland claimed that he was motivated to go to the Capitol by police brutality, that he lost everything when the government took his driver's license, and that his child support obligations do not stop. When the interviewer commented that it was surprising Copeland did not regret his travel to the Capitol, Copeland stressed that "the idea was to confront our lawmakers. The idea was to try and have a voice, to try to speak to people and say we're not getting what we want from our lawmakers. We want less limitations on our business and on our private lives. And that's not happening . . ." Copeland has acknowledged, in his statement of offense, that the purpose of his trip was, among other things, to attend the former President's rally. (ECF No. 34 ¶ 8.)

### *Copeland's Assaults Against Police Officers in the West Plaza*

In an interview with the FBI, Copeland said that he and his girlfriend went to visit monuments in Washington, D.C. during the morning of January 6, 2021. Copeland's Facebook account confirms this, as he posted photographs of him and his girlfriend at the Washington

Monument (Figure 5) and the World War II Memorial (Figure 6).



*Figure 5: Copeland and his girlfriend at the Washington Monument*



*Figure 6: Copeland and his girlfriend at the World War II Memorial*

Copeland explained that his girlfriend was pregnant on January 6, and was hungry before the former President's speech, so they left the area to find something to eat. When they returned to the area, they saw that a large number of people were walking to the Capitol. Copeland and his girlfriend joined this group.[3]

As discussed above, rioters breached the first, outer perimeter near the Peace circle at about 12:52 p.m., and flooded onto the West Plaza by about 12:58 p.m. By about 1:10 p.m., Copeland was present in the West Plaza. Copeland had worked his way to the front of the crowd. Video

---

[3] Copeland said that the rally had ended when he and his girlfriend returned to the area. This was wrong: the former President ended his speech at about 1:10 p.m., by which point Copeland was already in the West Plaza of the Capitol and was moments away from assaulting Officer T.R. and other Capitol Police officers. The defendant may have honestly, but mistakenly, concluded that the rally had ended when he saw the crowd advancing toward the Capitol.

recorded by another member of the crowd showed Copeland standing near the police line, shouting at the police. He appears to be outraged about something, and based on his subsequent statements, may have been set off by the blood that was visible on the ground.



*Figure 7: Copeland points at blood on the ground and yells at officers.*



*Figure 8: Copeland yells at Officer T.R. immediately before assaulting him.*

13

One of the officers who was on the West Plaza then was USCP Officer T.R. Officer T.R. is pictured in Figures 7 and 8, above, pointing toward Copeland. As can be seen here and in Exhibit 1,[4] Officer T.R. shouted at rioters and directed them, using hand signals, to back up. Another rioter, Christopher Quaglin, who was dressed in an American flag jacket, a helmet with a camera mounted on it, and a gas mask, ignored those directions and moved towards Officer T.R. Copeland then turned his attention from another officer to Officer T.R. and began yelling at him. Quaglin moved close to Officer T.R. and pointed his left index finger at Officer T.R.'s face. Copeland approached the two from behind Quaglin, and—using both hands—pushed Quaglin into Officer T.R. Quaglin responded by bringing his right arm around Officer T.R.'s side, clenching his left hand in an apparent attempt to grab Officer T.R.'s collar, and fell forward into Officer T.R., knocking him to the ground. (Exhibits 1, 2.) Officer T.R. injured his knee while defending the Capitol on January 6, 2021, and attributes that injury to this incident.

Copeland may contend he pushed Quaglin only slightly, if at all, and that any force he applied to Quaglin's back could not have caused Officer T.R. to fall. That would be incorrect. Immediately before the push, Officer T.R. moved to the base of a set of steps while speaking to Quaglin. (Exhibit 1 at 00:58.) Standing right next to those steps, Officer T.R. had no place to retreat and regain his balance when Quaglin made contact with him. From his close vantage, Copeland would have seen Officer T.R.'s vulnerable position.

---

[4] The Exhibits are all videos of Copeland's assaults. Exhibits 1 and 2 record the assault of Officer T.R. and its aftermath. Exhibits 3 through 5 record the struggle over the metal bike rack barricade.



*Figure 9: Three Screenshots from Exhibit 1, a video filmed from Copeland's right. Together, they show him approach and push Quaglin into Officer T.R.*



*Figure 10: Three Screenshots from Exhibit 2, a video filmed from above Copeland and to his left. They show the same event from a different perspective.*

Other USCP Officers rushed to Officer T.R.'s assistance. Copeland grappled with them, at times grabbing at their jackets or riot shields, at times lowering his body in an apparent attempt to prevent himself from being pushed. Over the course of about a minute, he fought against several USCP officers. (Exhibits 1, 2.)

15



*Figure 11: Two screenshots, from Exhibit 2, showing Copeland struggling with officers after assaulting Officer T.R.*

At about 1:13 p.m., as Copeland struggled against USCP Officers, Metropolitan Police Department (MPD) Officers arrived in the West Plaza and began to establish a perimeter of metal bike rack barriers across the Plaza. At about 1:15 p.m., another rioter attempted to snatch one of the bike racks from an MPD officer who stood behind the rack, with his hands on it. Copeland stood right next to this rioter and, as soon as the rioter grabbed the rack, Copeland grabbed it, too. He immediately joined in an effort to wrest the bike rack away from police. (Exhibit 3.)



*Figure 12: another rioter grabs at the barricade while Copeland stands immediately to his left, partially in frame.*

Other police officers joined in a tug-of-war effort to reclaim the bike rack. Several rioters

struggled over it, but Copeland struggled the most forcefully and for the longest period of time.
MPD officers shot chemical spray at Copeland. He responded by charging at them with the bike
rack and tossing the bike rack at them. (Exhibits 3, 4, 5.)



*Figure 13: Copeland pulls at the end of the barricade as a police officer deploys chemical spray at Copeland's face*



*Figure 14: Copeland pushes the barricade into police officers*

After this, Copeland appears to walk into the crowd. The government's evidence does not

reveal any further assaultive conduct by Copeland or any entry into the Capitol by Copeland.

### First Interview with the FBI and Text Messages / Facebook Posts about the Investigation

On February 11, 2021, the FBI interviewed Copeland in southern Utah. He admitted that he traveled to Washington, D.C. to attend the former President's rally on January 6, 2021, and that he was present in a crowd of people outside the Capitol building. He said that, when he arrived at the Capitol, he asked an officer if he could enter the building. The officer said no, and—referring to the "sea of people" behind him, Copeland told the officer "I don't think you get to decide." He also told the officer to let people in before something crazy happened.

Copeland claimed that officers were trying to arrest members of the mob, which Copeland viewed as "stealing" them. He admitted that he lost his temper when another protester was hit in the face with a rubber bullet and said that he and other rioters physically prevented officers from taking this person into custody.[5] After reviewing videos of his conduct during the riot, Copeland said "I just remember it was a fight." He admitted that he pushed Quaglin in the back toward the police line because he thought the police were trying to penetrate the mob and take custody of the rioter who was shot in the face. Copeland admitted to grabbing a police baton, and said he threw it over his shoulder in an effort to disarm the officer "so they couldn't beat us." He also admitted that he encouraged other rioters not to allow the police officers to take other members of the mob into custody. Copeland further admitted that during the incident with the bike rack fence, he was trying to remove the fence between police and protesters and was hoping to push the police line and fence back.

---

[5]     Other video footage, not submitted as an exhibit, shows a protester with a bloody, injured face, right before Copeland's assault of Officer T.R. This may have been the person who was shot.

Copeland said that he walked away from the police line near the Capitol because the pepper spray was affecting his vision, and because he feared escalating violence—especially if the police decided to use live ammunition on protesters. He said that he did not enter the Capitol building on January 6, 2021. Copeland also said, upon reviewing the video, that he was "shocked" and "amazed at the amount of time he engaged with law enforcement." He claimed that he did not travel to the Capitol with the intent of fighting police but hoped to have a civil discussion with elected officials or to conduct a "sit-in." When asked if he regretted his actions, Copeland said "not entirely, no, not really." He explained that "what happened there should never happen, again," but that he did "feel like what we were asking for [presumably, to get inside the Capitol and meet with Members of Congress] was not a demand that was outside of what we could ask for."

The FBI later learned that, shortly before this interview, Copeland sent the following text message to a group of friends: "To all of you out there please keep your rifles loaded and your heads down. I go to meet with the FBI in 15 minutes. Thanks for the portion of my life I shared with you. May god bless you and your lovely family. I don't know what's gonna happen in here but please don't let them steal my truck and stuff. Its parked on the third floor of the parking garage on the west side. The address is 20 N Main St, St. George, UT, 84770. Sincerely, Former US Army SGT. Landon K. Copeland"

Later, after the government sought and obtained a warrant for Copeland's arrest, he voluntarily surrendered to the FBI on April 28, 2021 and made his initial appearance before a Magistrate Judge Kohler in Utah on April 29. In a Facebook post on April 28, 2021, Copeland said, "So that everyone knows I go to see the FBI and a judge tomorrow. I guess peacefully protesting at the Capitol is now illegal and they are trying to hunt us all down to try and teach us

a lesson. Unfortunately only one option remains when we return. We bring guns and take the Capitol building without intention of being peaceful. This ends with the government bombing their own people. I had hopes [sic] it wouldn't. But here we are." Copeland wrote this despite knowing that he had fought with police officers and knowing, from his review of footage, that the FBI had proof that he fought.

### Initial Appearance before Magistrate Judge Meriweather

On May 6, 2021, the defendant appeared remotely before Magistrate Judge Meriweather in Washington, D.C. Six other defendants were also scheduled for initial appearances in cases arising out of the January 6, 2021, riot at the Capitol; Copeland's hearing was scheduled last. While on the telephone link to Judge Merriweather's courtroom, Copeland repeatedly spoke out of turn throughout the afternoon, often interrupting the other hearings.[6] At one point, Judge Meriweather directed the Courtroom Deputy to mute Copeland. *United States v. Anthony Alexander Antonio*, 1:21-mj-00375, Tr. 05/06/2021 at 19-20. During his own hearing, Copeland aggressively challenged the court, made unreasonable demands, and threatened physical violence if he did not get what he demanded. *United States v. Landon Kenneth Copeland*, 1:21-cr-00403 (RMM), Tr. 05/06/2021 at 7-31.

### Copeland's May 6, 2021 Threats Against His Pretrial Services Officer

During his initial appearance before Judge Meriweather, Copeland called his Pretrial Services Officer in Utah ("the PSO"). After hearing, Copeland sent his PSO a text message saying, among other things, "If they issue a warrant, they will have to come and get me, and it won't be

---

[6] The government understands that Copeland was connected to the virtual hearing by a telephone that did not have a video connection.

easy." Copeland drove to the PSO's office, where he banged his head against the glass partition in the lobby, pressed his face against the glass, and told his PSO that "If I was on the other side of this glass, I would eat you from the inside out because I am starving." This behavior continued for approximately 15 minutes.

This defendant's behavior prompted the PSO to submit a report arguing that "the U.S. Probation Office does not believe that any single condition or set of conditions can minimize the risk this defendant poses to officers and to the community at large." The PSO opined that Copeland might hurt or kill someone if allowed to remain on release. In response to this report, Magistrate Judge Kohler issued a warrant for Copeland's arrest.

### *Copeland's Media Interviews*

Copeland was arrested on May 11, 2021 and, ultimately, was ordered detained pending trial. While detained, Copeland interviewed with two media outlets. On May 14, 2021, Copeland interviewed with Fox affiliate in Utah for approximately 45 minutes. On June 4, 2021, Copeland interviewed with NBC Washington for approximately 30 minutes. Both interviews were recorded by the jail where Copeland is housed. In both interviews, Copeland spoke about his conduct on January 6, his motivations for traveling to the Capitol, and the events of May 6.

Copeland admitted to physical interactions with law enforcement officers, although he said that he "[didn't] think [he] committed a crime." He added that "you know, I have the capability of where I could have hurt those [officers]. But I didn't hurt them." Copeland further explained that he clashed with officers because he saw them "stealing" members of the crowd, and then made clear that he was using the word "steal" to mean "arrest":

> To me, that's stealing people like that, arresting them. To me, I call it stealing people. Because you literally steal them out of their life. Because they arrested me now, I literally won't get to see the birth of my daughter on July 25.

Copeland said that a person standing near him was shot in the face, and after this, an officer instructed another nearby individual to "come with me." When the officer reached out to touch this person, Copeland "lost control and started forcing [the officers] out of the crowd toward their own police line." According to Copeland, one officer started hitting him in the legs with a baton so Copeland took the baton. Another officer pushed him with a riot shield so Copeland took the shield. Copeland said he was subsequently shot in the back with a rubber ball grenade. He decided that "I'm going to get myself killed if I don't stop"; found his girlfriend, who had accompanied him on the trip but apparently did not join the mob; and left.

Copeland also admitted to struggling with officers over a crowd control gate. He claimed that the officers were holding the gate up and using the feet of the gate to stab at people so he and another person tried to take it from them.[7] Copeland said that when the officers deployed pepper spray he picked up the crowd control gate and tried to toss it over them.

In the NBC interview, Copeland also justified his behavior by comparison to a famous instance of police brutality. After hearing Copeland's account, the interviewer asked "but they're the police, though. You understand that part of it?" Copeland replied "Well I do understand they're

---

[7]      Body-worn camera footage disproves this claim, both as to MPD generally and as to the specific officer from whom Copeland tried to steal the bike rack. Based upon a review of USCP surveillance footage and body-worn camera footage, it appears that MPD officers held the bike racks with their feet pointed down as they tried to set a new perimeter. Undersigned counsel has seen no footage of MPD officers using the feet of the racks to stab people or to push them back. And as to the specific officer from whom Copeland tried to steal the rack: the rack was planted firmly on the ground, and the officer was standing next to it with his hands on it, when another rioter grabbed it away.

the police, but at the same time, it was a cop who killed Derek Chauvin. I mean, am I supposed to just let them go and kneel on everybody's neck, and stand there and watch them, until they're dead?"[8]

Copeland estimated that, on the day of the riot, the crowd numbered between three and five million people. Despite his perception of the crowd's size, Copeland claimed to expect that he and other rioters could simply enter the building, sit down with Members of Congress, and say "let's just discuss the election, and what's happened … let's postpone this thing momentarily so we can have a true investigation into the voter fraud." Copeland said he was surprised to be stopped outside the Capitol by law enforcement, and asked why he couldn't get in, saying "It [the building] doesn't belong to you. It belongs to us, the people."

Copeland also repeatedly referred to Members of Congress as authoritarians, and U.S. law as tyranny. He referred to police as the "dogmen" of a tyrannical government. He claimed that, given the former President's request that his supporters to go to the Capitol, police did not have the authority to bar visitors. Copeland also claimed that the person who ordered visitors barred "is the murderer of Ms. Ashli Babbitt." But despite these incendiary claims, Copeland also maintained that if he had the opportunity to speak with Members of Congress, and those Members told him that they would certify the electoral vote despite his objection, he would have walked out of the Capitol building and felt better for being heard.

Copeland also claimed he did not threaten his PSO. He acknowledged speaking to the PSO and said "I can give you the verbatim quote. It was 'I would eat your flesh for nutrients. I don't

---

[8]     This was an error: Derek Chauvin, a police officer, was convicted of murdering George Floyd by kneeling on his neck (among other offenses).

think you know what I am.'" Copeland failed to explain how this language was less threatening, or indeed different in substance at all, from what the PSO reported. Instead, Copeland maintained that "I was well within my First Amendment rights in speaking to him the way I did."

### III.    THE CHARGES AND PLEA AGREEMENT

On October 29, 2021, a federal grand jury returned a superseding indictment charging Copeland with Civil Disorder in violation of 18 U.S.C. § 231(a)(3); Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2); Inflicting Bodily Injury on Certain Officers, in violation of 18 U.S.C. § 111(a)(1) and (b); Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (two counts); Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b); Entering or Remaining in any Restricted Building or Grounds, in violation of 18 U.S.C. §§ 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4); Disorderly Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D); and Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F).

On May 19, 2022, Copeland pled guilty to Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1), a lesser-included offense of Count Six, which charged such an assault using a dangerous weapon.

### IV.    STATUTORY PENALTIES

Copeland now faces sentencing on Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1). As noted by the plea agreement and the U.S. Probation Office,

Copeland faces up to eight years of incarceration, a fine up to $250,000, and a term of supervised release of not more than three years for this offense.

## V.      THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The U.S. Probation Office has correctly calculated Copeland's offense level at 21 (PSR ¶¶ 43-52), which matches the calculation agreed upon by the parties in the plea agreement. (ECF No. 33 at 2-3.) That offense level is based on the following calculations:

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2 | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(3)(A) | Dangerous Weapon Used | +4 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3E1.1 | <u>Acceptance of Responsibility</u> | <u>-3</u> |
| | Total | 21 |

(ECF No. 33 at 2-3.) Probation calculates Copeland's criminal history as category III. (PSR ¶¶ 53-65.) This is different than the plea agreement, which estimated Copeland's criminal history category to be II. (ECF No. 33 at 3.) If the PSR is correct,[9] Copeland's Guidelines imprisonment range is 46 to 57 months of incarceration.

---

[9]     By letter to the Presentence Report writer, Copeland has noted several objections to this

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

---

category III calculation. First, they object that this calculation differs from the calculation in the plea agreement. But the plea agreement notes that "after the presentence investigation . . . a different conclusion . . . may be reached and [Copeland's] criminal history points may increase or decrease."

Second, Copeland argues that the criminal history points detailed in the PSR, ¶¶ 57 and 63, should not be counted. Copeland maintains that the former matter was disposed of by probation before judgment, which ultimately resulted in withdrawal of the plea and dismissal of the charges. He maintains further that the second matter should not count because it was a civil matter, conducted in front of a civil magistrate, and there was no finding of guilt or innocence. If Copeland is correct, the PSR likely would overstate his criminal history. At the time of this filing, however, the government does not have enough information to respond Copeland's objections. Undersigned counsel has requested further information from defense counsel about these convictions, and the government will conduct its own research before sentencing.

While looking at a defendant's individual conduct on January 6, this Court, in determining a fair and just sentence, should consider a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in or encouraged violence; (3) whether the defendant engaged in or encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of Copeland's crimes weigh heavily towards a significant term of incarceration. Copeland put himself at the front of the crowd, in a position to confront officers, and fight with them. Over the course of about five minutes, Copeland committed multiple assaults against multiple officers. Those assaults stemmed from hand-to-hand combat; essentially, they were part of a brawl.

Copeland told both the FBI and the media that he committed his first assault, against Officer T.R., because the Capitol police were "stealing" people. This is revealing. Copeland saw legitimate law enforcement activity, taken during an emergency—a violent mob that descended on the Capitol—as tyranny. He saw police response to assaults as "stealing" a person from their friends, and from their lives. In his mind, he and other rioters were entitled to enter the Capitol because it "belong[ed]" to them, the former President had said to go there, and in any event, the

crowd was too large to be stopped. When he told an officer "I don't think you get to decide" to keep people out, Copeland tacitly acknowledged that the situation was lawless: because of its size, the mob would rule. But Copeland also suggested the mob would be peaceful. In the views he expressed to the FBI and media, the protest would be a sit-in, the rioters would talk peacefully with Members of Congress, and there would be no violence if Congress failed to do as the rioters asked. The dichotomy between Copeland's views of law enforcement, and his views of his own conduct and motivations, reveal a central theme of this case: Copeland appears always to view his own motivations and actions as beyond reproach.

To his credit, Copeland did not participate in hours of violence. He had the presence of mind to leave the fray after about four minutes. This distinguishes him from some other rioters. But he did real harm while present. Officer T.R. injured his knee when Copeland pushed Quaglin into him, then spent hours defending the Capitol while injured. Other officers were worn down by the cumulative effects of multiple assaults, including Copeland's.

Copeland's later accounts of the riot, provided to the media, make clear that he has a skewed view of the day's events. His account of taking the bike rack to protect other rioters from being stabbed by its feet is just wrong. Nothing like that ever happened; Copeland invented a threat where none existed. His claim that his conduct wasn't assaultive because he could have hurt the officers, but didn't, is both wrong—he did injure Officer T.R.—and beside the point: his ability to have committed a more grievous assault neither serves as a defense nor mitigates his conduct.

The seriousness of Copeland's offense demands a lengthy sentence of incarceration. That Copeland seems to view his own behavior as impeccable underscores his continuing danger to the community, and counsels in favor of protecting it from him.

### B. Copeland's History and Characteristics

Copeland has a lengthy history of criminal convictions and contacts with law enforcement from 2012 through 2022 (ECF No. 36 ¶¶ 53-94), which weighs in favor of a lengthy period of incarceration. That history includes:

- A 2014 conviction for carrying concealed or loaded weapons, *id.* ¶ 57, and two 2020 arrests for possession of firearms with drugs and/or alcohol. *Id.* ¶¶ 77, 91.

- A 2013 military conviction for distribution of marijuana and related offenses, which led to his dishonorable discharge from the U.S. Army. *Id.* ¶ 56.

- A 2019 arrest for burglary, theft of a motor vehicle, theft of power tools after Copeland decided to settle a payment dispute by criminal self-help: stealing his employer's work van and selling the tools within. *Id.* ¶ 80.[10]

- Multiple arrests for what appear to be domestic violence matters involving his ex-wife. *Id.* ¶¶ 62 (in 2016, blocking her vehicle and trespassing on her property), 63 (in 2016, trespassing and slashing her tires), 84 (in 2018, burglary and child endangerment; she thought Copeland was trying to take their son from her house).

- A 2020 arrest stemming from an apparent mutual affray, during which Copeland is alleged to have fired a gun and then pointed that gun at one of the people he was fighting. He was also have alleged to have lighted that person's car on fire. *Id.* ¶ 72.

- Multiple motor vehicle offenses, including convictions for driving without a license and related offenses (ECF No. 36 ¶¶ 54, 55, 60); driving under the influence, *id.* ¶ 59; and numerous excluded traffic infractions, *id.* ¶ 66. They also include citations for driving without a license or insurance which did not result in conviction, *id.* ¶¶ 69-70; and traffic offenses which may remain unresolved because of Copeland's multiple failures to appear for court proceedings. *Id.* ¶¶ 73, 75, 78. In one of those matters, Copeland was charged with leaving the scene of an accident. *Id.* ¶ 73.

Copeland's convictions and arrests also confirm the persistent disrespect for governmental authority and indeed the legitimate role of government in society. This history underscores Copeland's apparent belief that his criminal conduct is above reproach and other people are

---

[10] Although this matter has not been resolved, the PSR notes that Copeland sent the victim text messages admitting to his theft of the victim's van.

treating him unfairly. This attitude does not bode well for Copeland's ability to abide by conditions of release or supervision. Nor does Copeland's decision to reject medically-approved treated for his apparently serious mental and emotional health issues, and instead to treat them with illicit drugs. Plainly, that course of conduct has not led to a law-abiding life. Indeed, the Presentence Report writer expresses "concerns over [his] ability to comply with the rules and instructions of the Probation Office . . . ." Copeland's history and characteristics strongly support a sentence of incarceration.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[11]  As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Copeland's criminal conduct, assaulting multiple law enforcement officers because he thought their efforts to do their job were wrong, and indeed tyrannical, is the epitome of disrespect for the law. When Copeland entered the Capitol grounds, it would have been abundantly clear to him that lawmakers, and the law enforcement officers who tried to protect them, were under siege. Law enforcement officers were overwhelmed, outnumbered, and in some cases, in serious danger. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other

---

[11]  Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.     The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[12] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

---

[12] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

31

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70. The gravity of these offenses demands deterrence. And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Copeland has spoken multiple times about his conduct at the Capitol: to the FBI, to the media at least twice, and now to the Presentence Report writer. To the government's knowledge, he has never expressed remorse for his assaultive conduct on January 6. His text message before meeting with the FBI, and Facebook message after being informed of his arrest, were apocalyptic and violent. He claimed that he was being persecuted for exercising his First Amendment rights, even though he knew he fought with police officers—and, after talking with the FBI, he knew that the FBI knew this. In his own words, if given the chance to go back in time to January 6, 2021, Copeland would choose—again—to assault members of law enforcement:

> Copeland:     Whatever the cost, I would willingly do it again for the people I love.
> Reporter:     Okay. You'd do it again? You'd go back to D.C.?
> Copeland:     I would do it all again for the people that I love. To defend those people against the attacks they were receiving? I would do it all again. To defend my people from the laws of tyranny that had been made? I would do it all again.

The sentence here must be sufficient to deter Copeland from committing future crimes of violence, particularly in light of his criminal history.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that

sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.    Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Copeland and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other § 111(a) defendants prior to January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

In those other cases, this Court and others have imposed lengthy sentences of incarceration. In some of those cases, courts have imposed sentences similar to that requested by the government, here. *E.g., United States v. Mattice and Mault*, 1:21-cr-00657 (BAH) (44 months of incarceration each); *United States v. Creek*, 1:21-cr-645 (DLF) (27 months of incarceration); *United States v.*

*Thompson.* 1:21-cr-461 (RCL) (46 months of incarceration); *United States v. Languerand*, 1:21-cr-353 (JDB) (44 months of incarceration); *United States v. Palmer*, 1:21-cr-328 (TSC) (63 months of incarceration); *United States v. Ponder*, 1:21-cr-00259 (TSC) (63 months of incarceration); *United States v. Rubenacker*, 1:21-cr-193 (BAH) (41 months of incarceration); *United States v. Fairlamb*, 1:21-cr-120 (RCL) (41 months of incarceration); *United States v. Miller*, 1:21-cr-75 (RDM) (33 months of incarceration).[13] In *Creek*, *Thompson*, *Palmer, Rubenacker*, *Fairlamb*, *Mault, Mattice, and Ponder*, the sentencing judges imposed sentences within the Guidelines range. In *Laguerand* and *Miller*, the sentencing judges varied downward from the Guidelines range based on factors that do not apply here.[14] The need to prevent unwarranted sentencing disparities counsels for a sentence within the Guidelines range.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[15] *United States v. Papagno*, 639

---

[13] Palmer's sentence is substantially longer than other sentences cited here and the sentence the government recommends in this case. That's because his criminal conduct was more violent than in these other cases.  In two different locations, Palmer assaulted officers with a variety of weapons including a wooden plank, the contents of a fire extinguisher, the fire extinguisher itself (twice), and a pole he used as an improvised spear. *Palmer* Sent. Tr. at 39-40, Dec. 17, 2021.

[14] *Languerand*, Sent. Tr. at 39, Jan. 26, 2022 (varying downward due to the defendant's difficult childhood and sincere regret for violent conduct); *Miller*, Sent. Tr. at 73-74, May 23, 2022 (varying downward due to the defendant's age, intoxication, and "exemplary record" before January 6, 2021). Additionally, in *United States v. Leffingwell*, 1:21-cr-5 (ABJ), the court varied downward due to defendant's expressions of remorse, multiple traumatic brain injuries, and the effect his conviction and sentences would have on his disability benefits. Sent. Tr. at 39-56, Feb. 10, 2022.

[15] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of

F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Copeland must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Copeland played in the riot on January 6.[16] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $1,495,326.55" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in mid-May 2021. *Id.* Copeland's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶ 141.[17]

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a

---

the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[16] Unlike the Sentencing Guidelines, under which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[17] Pursuant to 18 U.S.C. § 3664(b)(5), the government may further request a hearing for a final determination on any restitution owed to Officer T.R.

sentence of imprisonment of 52 months, which is a mid-range given the offense level agreed to by

the parties and the criminal history as calculated by the Presentence Report, restitution of $2,000,

and the mandatory $100 special assessment for each count of conviction.

<div style="margin-left: 40%;">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    */s/ Michael J. Romano*
MICHAEL J. ROMANO
IL Bar No. 6293658
Trial Attorney, Detailee
555 4th Street, N.W.
Washington, D.C. 20530
Telephone No. (202) 307-6691
michael.romano@usdoj.gov

</div>

37